UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| BETTY LUCIER-MAYO, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>CENTREVILLE BANK )<br><br>Defendant. ) | Case No. _____<br><br>**CLASS ACTION**<br>**JURY DEMAND** |

## CLASS ACTION COMPLAINT

Betty Lucier-Mayo ("Plaintiff"), on behalf of Plaintiff and all others similarly situated, files this complaint ("Complaint") as a putative class action lawsuit ("Action" or "Class Action") against Centreville Bank ("Defendant") based on personal knowledge as to all matters related to Plaintiff, and upon information and belief, obtained in part from an investigation by Plaintiff's attorneys as to all other matters, and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this Action individually and on behalf of a putative class of similarly situated consumers ("Class" or "Class Members') against Defendant, arising from Defendant's routine practice of assessing thirty-two ($32) dollar fees ("OD Fees") on transactions that did not actually overdraw checking accounts.

2.     Defendant misleadingly and deceptively misrepresents its fee practices, including upon information and belief, in its take-it-or-leave-it form adhesion contract.

1

3.     This Action seeks monetary damages, restitution, declaratory, and injunctive relief.

4.     As described herein, Defendant's practices violate Rhode Island common law and, upon information and belief, the contract. These practices also unjustly enrich Defendant at its account holders' expense and violate the Rhode Island Deceptive Trade Practices Act (DTPA).

5.     Defendant's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of similarly situated consumers. Unless enjoined, Defendant will continue to engage in these schemes and cause substantial injury to its consumers.

6.     Plaintiff asserts this action pursuant to the Federal Rules of Civil Procedure, Rule23, on behalf of Plaintiff and the Class, seeking monetary damages, restitution, and declaratory and injunctive relief.

## PARTIES

7.     Plaintiff is a citizen and resident of the State of Connecticut and has had a checking account with Defendant at all times material hereto.

8.     Defendant is a bank with over $2.2 billion in assets. Defendant's headquarters and principal place of business is in West Warwick, Kent County, Rhode Island. Defendant provides retail banking services to its members, including Plaintiff and Class Members.

## Venue & Jurisdiction

9.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original Jurisdiction because: (1) the proposed Class is comprised of at least one hundred (100) members, 28 U.S.C. § 1332(d)(5)(B); (2) at least one member of the proposed Class is a citizen of a State other than Rhode Island (the state of which Defendant maintains its principal place of business), 28 U.S.C. § 1332(d)(2)(A);

and, (3) the aggregate claims of the proposed Class exceed five (5) million dollars, exclusive of interest and costs.  28 U.S.C. § 1332 (d)(6).

10.    This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in this state and because Defendant has otherwise intentionally availed itself of the markets within this state through its business activities, such that the exercise of jurisdiction by this Court is proper.

11.    Venue is proper in this judicial district because the claims alleged in this action accrued in this judicial district, and the Defendant regularly transacts its affairs in this judicial district.

## Factual Background

12.    Overdraft fees are among the primary fee generators for banks.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *See*, https://bit.ly/3cbHNKV (last visited 9-21-2023).

13.    Unfortunately, the customers assessed these fees are the most vulnerable. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  *Overdrawn: Consumer Experiences with Overdraft*, Pew Charitable Trusts 8 (June 2014). *See*, https://bit.ly/3ksKD0I (last visited 9-21-2023).

14.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

15.    Plaintiff, like thousands of others, has fallen victim to Defendant's Overdraft Fee revenue maximization scheme.

16.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely.  Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021). *See*, https://nbcnews.to/3DKSu2R (last visited 9-21-2023); Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022).  *See*, https://bit.ly/3iTAN9k.

17.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all overdraft fees by the summer of 2022.  *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

18.     This practice breaches Defendant's standardized adhesion contract, including the Terms and Conditions of Your Account document ( "Contract).  Attached as **Exhibit A** hereto.

## I.     DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  **The Contract**

19.     At all times material hereto, Plaintiff had a checking account governed by the Contract.

20.     The Contract is a standardized form of contracts for deposit accounts, the material terms drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all of its deposit account customers.

### B.  **Overview of the Claim**

21.     Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what is referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

22.     Here is how the practice works.  At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount.  As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

23.     However, Defendant still assesses crippling thirty-two ($32) dollar OD Fees on many of these transactions and misrepresents its practices in the Contract.

24.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance.  These types of transactions are APSN Transactions.

25.     Defendant maintains a running account balance, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made.  When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance.  Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement.  This is commonly referred to as a "debit hold."  During the time the debit hold remains in place, which

5

may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

27.     That means when subsequent intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions.  Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

28.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

29.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed.  They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a

manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

30.     There is no justification for these practices other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

31.     However, Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

32.     Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**A. Mechanics of a Debit Card Transaction**

33.     A debit card transaction occurs in two parts. First, the merchant instantaneously obtains authorization for the purchase amount from the Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

34.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the transaction amount but does not yet transfer the funds to the merchant.

35.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

36.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization.  For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined.  At that point—and only that point—Defendant may choose to either pay the transaction or decline it.  When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge.  This "must pay" rule applies industry wide and requires that once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity.  *See,* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

37.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**B.  Defendant's Contract**

38.     Plaintiff had a Defendant checking account at all times material hereto governed by the Contract.  Ex. A.

39.     Defendant promises in the Contract that:

An overdrawn account will typically result in you being charged an overdraft fee or an NSF fee.  Generally, an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway.

Ex. A.

40.    In breach of these promises, Defendant assesses thirty-two ($32) dollar OD Fees on debit card transactions when there is "enough money" in the account "to pay the transaction."

41.    Defendant also promises that it will place holds on funds at the time of authorization of a debit card transaction, which is when Plaintiff pays the merchant, and that these holds reduce the account's available balance.  Ex. A.

42.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

43.    The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item.  Of course, that is not true for APSN Transactions.

44.    In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, and then fails to use those same funds to post those same transactions.  Instead, it uses a secret posting process described below.

45.    All of the above representations and contractual promises are untrue.  Defendant charges fees even when sufficient funds exist to cover authorized transactions into a positive balance.  No express language in any document states that Defendant may impose fees on any APSN Transactions.

46.    First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which sufficient funds are available to cover throughout their lifecycle.

47.    Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so.  This discrepancy between

Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

48.    Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

49.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later.  But that is what Defendant does when it re-debits the account during a secret batch posting process.

50.    Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

51.    At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds.  As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

52.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

53.    This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

54.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

55.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

56.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed overdraft fees on APSN Transactions.

57.    For example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn.  The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.  As a result, your available balance will be reduced by $60 so your available balance is only $40.  Your actual balance is still $100.  Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears.  Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019).    *See*, https://bit.ly/3kX0iXo (emphasis in original)(last visited 9-21-2023).

58.    Defendant and its accountholders make no such agreement.

### C.  Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

59.    Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with the immediate withdrawal of funds for debit card transactions.  This is because if funds are immediately debited, they cannot be depleted by intervening subsequent

transactions.  If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

60.      Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

61.      Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards, as the money comes directly out of the checking account.

62.      Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account.  Also, when you use a debit card, you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019).  *See*, https://bit.ly/3v5YL62(last visited 9-21-2023).

63.      This understanding is a large part of why debit cards have risen in popularity.  The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016) *See*, https://on.mktw.net/3kV2zCH (last visited 9-21-2023).

64.      Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash permanently and irreversibly.

65.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would.  Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016). *See*, https://bit.ly/3v7SvL1 (last visited 9-21-2023).

66.     In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

67.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

68.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

69.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this widespread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer    Compliance    Supervisory    Highlights*,    FDIC    3    (June    2019).    *See*, https://bit.ly/3t2ybsY(last visited 9-21-2023).

70.    Despite this recommendation, Defendant continues to assess OD Fees on transactions authorized on sufficient funds.

71.    Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

72.    Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

**D. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

73.    On or around March 8, 2021, Plaintiff was assessed thirty-two ($32) dollar OD Fees, even though the transactions that purportedly caused these fees had been previously authorized on sufficient funds.

74.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

## II.    NONE OF THESE FEES WERE ERRORS.

75.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

76.    Therefore, Plaintiff had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

77.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## III.    THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

78.    Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party.  This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers.  Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

79.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts.  But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

80.     Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner.  By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith.  This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

81.     It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

82.     When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations.  Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

### Class Allegations

83.     Plaintiff brings this action individually and as a class action on behalf of themselves and the following proposed Class:

> The Class: All Defendant checking accountholders who, during the applicable statute of limitations, were checking account holders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized (the "APSN Class").

84.     Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

85.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

86.     This action is properly maintainable as a class action under the Federal Rules of Civil Procedure, Rule 23.

87.     The Class consists of thousands of members, such that joinder of all Class Members is impracticable.

88.     *Numerosity*.  The members of the Class are so numerous that separate joinder of each member is impracticable.  Upon information and belief, and subject to Class discovery, the Class consists of many thousands of members, the identity of whom are within the exclusive knowledge of Defendant and can be ascertained only by resorting to Defendant's records.  Through the evaluation of Defendant's data, it is possible to identify all members of the Class and the amount of improper fees paid by each Class Member.  Such specific information is not otherwise available to Plaintiff but must be maintained pursuant to federal law and is subject to suitable discovery.

89.     *Commonality*.  There are numerous questions of law and fact common to the Class relating to Defendant's business practices challenged herein, and those common questions predominate over any questions affecting only individual Class Members.  The common questions include, but are not limited to:

- o   Whether Defendant assesses OD Fees on APSN Transactions;

- o   Whether these practices breach the Contract;

- o   Whether Plaintiff and other members of the Class have sustained damages as a result of Defendant's assessment and collection of the improper fees;

- o   Whether Defendant breached the covenant of good faith and fair dealing;

- o   Whether Defendant unjustly enriched itself to the detriment of Plaintiff and Class Members;

o   Whether Defendant violated the  Rhode Island Deceptive Trade Practices Act;

o   the proper measure of damages; and

o   the declaratory and injunctive relief to which the Class is entitled.

90.    *Typicality.*  Plaintiff's claims are typical of the claims of the other Class Members in that they arise out of the same wrongful business practice by Defendant, as described herein.

91.    *Adequacy of Representation.*  Plaintiff is an adequate representative of the Class because Plaintiff has a Defendant checking account and has suffered damages as a result of Defendant's assessment and collection of improper fees.  In addition:

o   Plaintiff is committed to the vigorous prosecution of this action individually and on behalf of all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

o   There is no hostility of interest between Plaintiff and the unnamed Class Members;

o   Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

o   Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

92.    *Predominance.*  The questions of law and fact common to the Class, as set forth in the "commonality" allegation above, predominate over any individual issues.  As such, the "commonality" allegations are restated and incorporated herein by reference.

93.    *Superiority.*  A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy.  Since the amount of each

individual Class Member's claim is very small relative to the complexity of the litigation and since the financial resources of Defendant are enormous, no Class Member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class Members will continue to suffer losses, and Defendant's misconduct will proceed without remedy. In addition, even if Class Members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

94.     All conditions precedent to bringing this action have been satisfied and/or waived.

## FIRST CAUSE OF ACTION
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
### (on behalf of Plaintiff and the Class)

95.     Plaintiff alleges and incorporates by reference every allegation contained in this Complaint's preceding paragraphs as though fully restated and set forth herein.

96.     Plaintiff and Defendant have contracted for bank account deposit, checking, and debit card services. *See,* Ex. A.

97.     Similarly, all Class Members have contracted with Defendant for bank account deposit, checking, and debit card services. *Id*.

98.     Defendant's account holders, including Plaintiff and the Class Members, are subject to the Contract.

99.     Defendant misconstrued in the Contract its true fee practices and breached the express terms of the Contract.

100.    No contract provision authorizes Defendant to charge OD Fees on APSN Transactions.

101.    Under Rhode Island law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers banking transactions.

102.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

103.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of good faith and fair dealing violations are a willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

104.    Defendant has breached the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

105.    Defendant harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

106.    Plaintiff and Class Members have performed all, or substantially all, of the obligations imposed on them under the Contract.

107.    Plaintiff and Class Members have sustained damages because of Defendant's breach of the Contract.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (on behalf of Plaintiff and the Class)

108.    Plaintiff alleges and incorporates by reference every allegation contained in this Complaint's preceding paragraphs as though fully restated and set forth herein.

109.    Plaintiff, individually and on behalf of the Class, asserts a common law claim for unjust enrichment.  This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason.  In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

110.    Through Defendant's wrongful conduct alleged herein, Defendant knowingly assessed fees upon Plaintiff and the  Class Members that are unfair, unconscionable, and oppressive.

111.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the members of the Class.

112.    Plaintiff and Class Members conferred a benefit on Defendant at the expense of Plaintiff and Class Members when they paid improper fees.

113.    Defendant appreciated this benefit in the form of the substantial revenue that Defendant generates from the imposition of such fees.

114.    Defendant has accepted and retained such fees under inequitable and unjust circumstances.

115.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to retain the benefits it received and is still receiving, without justification, from the imposition of OD Fees on APSN Transactions on Plaintiff and Class Members in an unfair, unconscionable, and oppressive manner.  Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

116.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and Class Members and should be required to make restitution to Plaintiff and Class Members.

**THIRD CAUSE OF ACTION**
**Violation of the Rhode Island Deceptive Trade Practices Act**
(on behalf of Plaintiff and the Class)

117.    Plaintiff alleges and incorporates by reference every allegation contained in this Complaint's preceding paragraphs as though fully restated and set forth herein.

118.    Defendant has violated the DTPA, R.I. Gen. Law § 6-13.1, *et seq*.

119.    Section 2 of the DTPA, R.I. Gen. Law § 6-13.1-2, states:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade are declared unlawful.

120.    Unfair or deceptive acts or practices that Defendant violated include, but are not limited to:

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(vii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(xii) engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;

(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;

(xiv) Using any other methods, acts, or practices that mislead or deceive members of the public in a material respect;

*See,* R.I. Gen. Law § 6-13.1-1(6).

121.    Defendant's conduct, the specific acts relating to Defendant's overdraft fee revenue maximization scheme, as alleged herein, occurred in the course of trade or commerce under a private contract between Plaintiff and Defendant and is not subject to the exemption provision contained in R.I. Gen. Law §§ 6-13.1-4(a).

122.    Plaintiff is entitled to bring an action on behalf of herself and the members of the Class for violations of the DTPA pursuant to R.I. Gen. Law §§ 6-13.1-5.2(a)-(b).

123.    Defendant knowingly and intentionally employed an unfair and deceptive policy and practice of charging OD Fees on transactions that did not actually overdraw the account and misrepresenting and failing to disclose its policy and practice of charging OD Fees on these transactions.

124.    Defendant also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated DTPA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to Defendant.

125.    Defendant's statements and omissions were material and were likely to mislead, deceive, or create a likelihood of confusion for Class Members and, in fact, did mislead, deceive, and confuse Class Members.

126.    Defendant made these statements and omissions with the intent that Plaintiff and Class Members would rely on them.

127.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered actual damages.

128.    Plaintiff and Class Members are entitled to "actual damages or five hundred dollars ($500), whichever is greater." Additionally, the court may award damages equal to three times the amount of actual damages and provide other equitable relief that it deems necessary and proper. *See,* R.I. Gen. Law § 6-13.1-5.2(a).

129.    Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs. *See,* R.I. Gen. Law §§ 6-13.1-5.2(d).

## **Prayer**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a.  Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

b.  Award Plaintiff and the Class actual damages in amount according to proof;

c.  Award Plaintiff and the Class restitution in an amount to be proven at trial;

d.  Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

e.  Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

f.  Declare Defendant's practices outlined herein to be unlawful and a breach of contract;

g.  Enjoin Defendant from engaging in the practices outlined herein;

h.  Grant Plaintiff and the Class a trial by jury;

i.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

j.  Grant such other relief as the Court deems just and proper.

Dated: September 25, 2023

Respectfully submitted,


/s/ Peter N. Wasylyk
Peter N. Wasylyk
(RI Bar No. 3351)
**Law Offices of Peter N. Wasylyk**
1307 Chalkstone Avenue
Providence, RI 02908
Tel: (401) 831-7730
Fax (401) 861-6064
Email: pnwlaw@aol.com


Jeffrey D. Kaliel *
Sophia G. Gold *
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
(202) 350-4783
Email: jkaliel@kalielgold.com
Email: sgold@kalielgold.com


**JOHNSON FIRM**
Christopher D. Jennings*
Tyler B. Ewigleben*
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
Email: chris@yourattorney.com
Email: tyler@yourattorney.com


* *Pro Hac Vice* applications to be submitted

*Counsel for Plaintiff and the Proposed Class*